### VAN WINKLE v. HENKLE et. al.

No. 10018—Opinion Filed Dec. 23, 1919.

(Syllabus by the Court.)

**1. Fraud—Definition.**

Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise, and are resorted to by one individual to get an advantage over another by false suggestions or by the suppression of the truth. No definite and invariable rule can be laid down as a general proposition defining fraud, as it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated.

**2. Appeal and Error—Review of Equity Case.**

In cases of purely equitable cognizance the judgment of the trial court upon the facts will not be disturbed on appeal unless it appears that the judgment rendered is clearly against the weight of the evidence.

**3. Oil and Gas—Lease—Cancellation for Fraud—Sufficiency of Evidence.**

Record examined, and held, that after a careful examination of the record we are not prepared to say that the judgment ren-

dered by the trial court is against the clear weight of the evidence.

Error from District Court, Kay County; W. M. Bowles, Judge.

Action by W. H. Henkle and another against J. M. Van Winkle. Judgment for plaintiffs, and defendant brings error. Affirmed.

L. A. Maris, for plaintiff in error.

W. S. Cline and C. L. Pinkham, for defendants in error.

KANE, J. This was an action, commenced by the defendants in error, plaintiffs below, against the plaintiff in error, defendant below, for the purpose of cancelling and setting aside an oil and gas lease for fraud in its procurement. Upon trial to the court, without the intervention of a jury, judgment was rendered in favor of the plaintiffs, to reverse which this proceeding in error was commenced. Hereafter, for convenience, the parties will be called "plaintiffs" and "defendant", respectively, as they appeared in the trial court.

The grounds relied upon for reversing the judgment of the trial court are stated by counsel for the defendant in his brief as follows:

"Point One. The evidence in this case does not establish the acts constituting fraud with that clearness and certainty which the law requires in order to entitle the plaintiff to equitable relief; there is not that clear and most convincing proof of any acts of fraud committed by the defendant, such as are necessary to induce a court of equity to exercise its powers and grant relief to the plaintiff.

"Point Two. There is no sufficient proof in the record that the defendant knew or had any knowledge or information that oil had been found in the Thompson well at the time of negotiating for and procuring the lease from the plaintiff in this action.

"Point Three. There is no proof whatever in the record that at the time the defendant negotiated for and procured the lease from the plaintiff that it was worth any more than the price which defendant paid plaintiff for it, or that it could have been sold for a larger sum. There is no evidence in the record to show that plaintiff was in any way damaged or suffered any financial loss by the execution and delivery of the lease to the defendant.

"Point Four. The evidence is uncontradicted that to get $1,250 for his lease, which was $150 more than the defendant otherwise would have given, the plaintiff committed a fraud upon his neighbor, Thompson, by suppressing and concealing from Thompson the fact that he was receiving the extra $150 because of his inducing Thompson to lease his quarter section, right in the same vicinity,

for the sum of $150. Because of the practicing of this fraud upon his neighbor in the transaction, which he now asks the court of equity to set aside, the plaintiff must be denied all equitable relief."

It is quite apparent that all of these points raise but one question, and that is the sufficiency of the evidence to sustain the judgment rendered by the trial court.

The facts over which there is no controversy may be briefly summarized as follows:

For some months prior to the execution of the lease in question an oil well was in process of drilling on the Thompson farm, situated about one mile north of the Henkle place. The plaintiff Henkle resided in McPherson, Kan., and was at home on the 6th day of March, the date oil was found in this well. On the next day, to wit, March 7th, the defendant Van Winkle left Ponca City for the express purpose of procuring an oil and gas lease from the plaintiff. Just before oil was discovered in the Thompson well, Henkle had offered to lease his land to Van Winkle, but the latter was not interested in the matter at that time and referred Henkle to Mr. Marland, a competitor in the oil business, saying that Mr. Marland might lease it, that he could not at that time. Later Mr. Van Winkle changed his mind about leasing the Henkle place and called upon Mr. Henkle for the avowed purpose of obtaining a lease. Mr. Van Winkle found Henkle at his home near McPherson, Kansas, on the 8th day of March, and a dispute as to what was said in the conversation which occurred at this meeting forms the principal basis for this controversy. Counsel for the defendant states in his brief Mr. Henkle's version of this conversation in narrative form as follows:

"I saw him on the 8th day of March, this year, at McPherson, Kansas. He came up there to get our oil and gas lease, about 9 o'clock on this morning or something like that. No one was present but he and I. We were standing there in the road, we talked a little bit about our place, and he said he came up here to see about getting this lease, and I said: 'All right; what about it?' He said: 'Now, the Thompson well is a dry hole: we thought just before things got too dead down there we would simply get together and get to work and get another test hole. We are getting the Weeden lease and we want to get yours, and Marland will go in with us and we will throw in and drill another test well. * * * ' We kept talking and he wanted me to take the lease for $800, and I wouldn't do it, and then he said, 'I will give you just $1,000 for the lease.' He says, 'I suppose that the rest of the bunch at home will almost kill him for doing that. I told him I

would do nothing of the kind, and he said that he might just as well go, and got up and stepped to the 'phone and wanted to find out the garage man's number. He called up the central girl, but didn't get the man, so we sat down and talked it over again; he said he would give me a $1,000 and would give my wife $100 for signing it; I told him I would not do it, and offered to take $1,600 and him drill a hole on us within a year; he said the other men would have as much to say about where the hole was to be located as he would; he then called the garage man and it wasn't but a few minutes until he came out, so we went out to the car and he then told this story over to the garage man—that he had offered me a $1,000 for the lease and a dry hole within a mile of it; I stepped up and says, 'You might get Mr. Thompson's land there; he has a farm there just a mile of us;' he said, 'You might get his lease; you might go over and see him; I will go over with you;' he asked where the Thompson lease was. I told him and he said he wouldn't give much for it. This was a different lease from the one the well was being drilled on. I told him I didn't want the blame thrown on me, that I wanted to see development, that I would take $1,250, go with him to Thompson and help him to get the Thompson lease; he says, 'Get in the car, let's go.' We went to town, to the bank, before a notary public and drawed up the lease. * * * We did not learn anything in relation to the Thompson well and its condition until Monday afterwards; we made the lease on the 8th, which was Thursday. Upon receiving the information of the Thompson well I came down to this county, staying all night here in Newkirk; got in a car with Mr. Thompson, went out to the well; we came down on Friday night and went out to the well. A couple of men from Kansas and I took a car and went out to the well. * * * I saw Mr. Van Winkle while I was down there; I came back to Newkirk and went to Ponca City and saw him at his office. I called on him and he asked me to come into his private room. I asked him if he didn't believe he gave us a bad deal on the lease. I told him I thought he kind of pulled it over us, that they had oil out there; that I didn't believe we had gotten a square deal; I told him I would give him back a check for his money and asked him to cancel the lease. He said he wouldn't think of doing that."

There was other evidence offered by the plaintiff tending to show that Van Winkle was in the neighborhood of the Thompson well on the 6th of March and probably knew that oil had been discovered before leaving for Kansas to procure the Henkle lease. The fraud complained of consisted in the representations of Van Winkle to Henkle that the Thompson well was a dry hole, after being apprised that the contrary was true.

The defendant testified that he knew nothing about the condition of the Thompson well

on the 6th day of March, that he had not been there for ten days or two weeks prior to that date, and that on the 7th day of March he went to McPherson to procure the plaintiff's lease to make up a block of leases and put in a test well, just as he had told Mr. Henkle. He denied saying specifically that the Thompson well was dry. His version of what was said during the conversation between himself and Henkle at the time of the execution of the lease is stated in narrative form in the brief of his counsel as follows:

"I didn't say very much on the question of taking the lease. I told him if this well up there (meaning the Thompson well adjoining the plaintiff's land) should be a duster, should not produce oil and it looked like at that time it wouldn't, that we wanted to try to drill another hole down there. And again, we talked about it probably being a dry hole; I was sincere in the statement that it looked like it was dry; I never was so sure of anything in my life."

Mr. Van Winkle also denied that he was in the vicinity of the Thompson well on the 6th of March as testified by other witnesses. He admits being there in the circumstances testified to a week or two previously, and his evidence, as corroborated by other witnesses rather conclusively shows that the witnesses for the plaintiff were probably mistaken in fixing the date as the 6th of March. But, conceding this, there is still a sharp conflict between Mr. Henkle and Mr. Van Winkle as to whether Mr. Van Winkle said positively that the Thompson well was dry, or whether he merely stated that in his opinion it would be a dry hole when completed. On the whole, we think it is a very close case on the facts. But, after a careful examination of the record, we are not prepared to say that the judgment rendered by the trial court is against the clear weight of the evidence.

Black on Rescission and Cancellation, section 21, says:

" 'Fraud' is said to be a generic term, which embraces all the multifarious means which human ingenuity can devise, and are resorted to by one individual to get an advantage over another by false suggestions or by the suppression of the truth. No definite and invariable rule can be laid down as a general proposition defining fraud, as it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated. The only boundaries defining it are those which limit human knavery."

The author cites, as supporting this language, Barr v. Baker, 9 Mo. 850; Cooper v. Fort Smith & W. R. Co., 23 Okla. 139.

In the case at bar the trial court had the witnesses before him and had ample opportunity to observe their demeanor while upon the stand, their candor, or lack of candor, and was therefore in much better situation to weigh the evidence in a close case than this court could possibly be. This is the reason for adopting the rule hereinbefore referred to and so often followed by this court, that in cases of purely equitable cognizance the judgment of the trial court upon the facts will not be disturbed on appeal unless it appears that the judgment rendered is clearly against the weight of the evidence. Tested by this rule, the judgment of the trial court must stand.

For the reasons stated, the judgment of the court below is affirmed.

OWEN, C. J., RAINEY, V. C. J., and JOHNSON, PITCHFORD, HIGGINS, and BAILEY, JJ., concur.